# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| Dew Drop Inn, 1027 N. 4th Street, Watertown, Wisconsin, fully described in Attachment A | ) ) ) ) |

Case No. 19-M-021

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

Dew Drop Inn, 1027 N. 4th Street, Watertown, Wisconsin, fully described in Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☒ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 1591 (sex trafficking), 1594 (conspiracy to engage in sex trafficking), 1952 (use of facility in interstate commerce to carry on or distribute the proceeds of prostitution activity unlawful under state law), and 1956 (money laundering) and 922(g)(3) (possession of firearms by an unlawful drug user); as well as Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to account for or pay tax), 7206(1) (tax fraud and false statements), and 7206(2) (assisting preparation of false or fraudulent tax documents).

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Neal Lofy, FBI Task Force Officer
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Jan. 22, 2019

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

David E. Jones , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Neal Lofy, being first duly sworn, hereby depose and state as follows:

## I.   AGENT BACKGROUND AND EXPERIENCE

1.      I am a Detective with the Racine Police Department, a position I have held for the past six years, and I have been employed by the Racine Police Department since 2006.  Since 2013, I have been assigned to the Special Investigations Unit as the lead investigator on the Greater Racine Human Trafficking Task Force.

2.      On October 5, 2015, I was deputized as a Task Force Officer with the Federal Bureau of Investigation (FBI).  I am assigned to the Milwaukee Division's Child Exploitation Task Force, which investigates violations of federal law including, but not limited to, the coercion and enticement of a minor to engage in sexual contact, and the sexual exploitation and sexual abuse of minors.  I am also assigned to the FBI's Wisconsin Human Trafficking Task Force, which investigates the illegal trafficking of persons, both domestic and foreign, for the purposes of labor and commercial sex acts.

3.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

4.      Throughout this affidavit, "case agents" refers to the federal, state, and local law enforcement officers who have participated directly in this investigation, and with whom I have had regular contact regarding this investigation.  The case agents in this investigation have included law enforcement officers from the FBI, Dodge County Sheriff's Office (DCSO), Internal Revenue Service – Criminal Investigation, Department of Labor – Office of Inspector General,

Hartford Police Department (HPD), Wisconsin Department of Justice, Division of Criminal Investigation, and the Federal Deposit Insurance Corporation – Office of Inspector General.

5.    This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## II.    PURPOSE OF AFFIDAVIT

6.    I make this affidavit in support of applications for the following search warrants:

   a.    A warrant to search the premises known as the **Wild Rose Gentleman's Club (formerly TNT Gentleman's Club), N866 County Road R, Lebanon, Wisconsin**, more particularly described in Attachment A to that application;

   b.    A warrant to search the premises known as the **Dew Drop Inn, 1027 N. 4th Street, Watertown, Wisconsin**, more particularly described in Attachment A to that application;

   c.    A warrant to search a **black iPhone Model A1660, FCCID: BCGE3085AIC579C-E3085A**, more particularly described in Attachment A to that application; and

   d.    A warrant to seize and search a cellular phone used by **Radomir Buzdum** and associated with telephone number **(920) 248-3360**.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that, on the premises described in Paragraph 6, there exists evidence of violations of Title 18, United States Code, Sections 1591 (sex trafficking), 1594 (conspiracy to engage in sex trafficking), 1952 (use of facility in interstate commerce to carry on or distribute the proceeds of prostitution activity unlawful under state law), 1956 (money laundering), and 922(g)(3) (possession of firearms by an unlawful drug user); as well as Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to account for or pay tax), 7206(1) (tax fraud and false statements), and 7206(2) (assisting preparation of false or fraudulent tax documents) as described in Attachment B to each application.

2

## III.    PROBABLE CAUSE

### A.    Overview

8.    Case agents have been investigating Christopher Childs, Jennifer Campbell, and others for using force, fraud, and coercion to cause victims to engage in commercial sex acts. Childs currently is charged in Case No. 18-CR-69 (PP) with five counts of sex trafficking of adult victims by force, fraud, and coercion and one count of sex trafficking of a minor. Childs and Campbell (who served as Childs' "bottom" prostitute) also are charged with one count of conspiracy to engage in sex trafficking.

9.    The investigation to date has revealed that many of Childs' sex trafficking activities took place in strip clubs located in Dodge County, Wisconsin, including what is now called the Wild Rose Gentleman's Club, formerly TNT, N866 County Road R, Lebanon, Wisconsin. Because this club was called TNT throughout the majority of the time relevant to this investigation, it will be referred to hereinafter as TNT.

10.    The investigation to date has revealed that the managers and employees of TNT knew of, facilitated, and profited from sex trafficking offenses undertaken by Childs and other pimps at the club. The investigation to date has also revealed that TNT has been underreporting its income, in turn causing Buzdum to underreport his income, and paying its employees partially or totally in cash.

### B.    Background on TNT

11.    Based on information from witnesses and records reviewed by case agents, I am aware that TNT is owned by Radomir Buzdum ("Buzdum"). Since 2001, Buzdum has been the registered agent of Tequila Nights, Inc., which encompasses two businesses, TNT and the Dew Drop Inn, a tavern located at 1027 N. Fourth Street in Watertown.

3

12.     Initially, Buzdum operated TNT at 942 Main Street, in Clyman, Wisconsin. However, in approximately 2007, Buzdum sold the Clyman property to Don Raffaelli and Michael Siegel, who began operating a strip club at that location known as the Hardware Store.

13.     Buzdum purchased the building that houses TNT in April 2002. Initially, Buzdum and his wife (Dawn) and/or various lessees operated a supper club at the site. In 2008, one of Buzdum's lessees, with Buzdum's assistance, turned the supper club into a strip club called the Roadhouse. In approximately 2011 or 2012, after the lessee defaulted on the contract, Buzdum took back control of the property and continued to operate it as a strip club that he soon renamed TNT. Buzdum promoted former Roadhouse bouncer Timothy Miller ("Miller") to be the club's manager. Miller managed TNT until late August 2017, when he was terminated. At that time, Buzdum hired former TNT bouncer Jacob Maroo to be TNT's new manager.

14.     In July 2018, after TNT received negative publicity following the March 29, 2018 arrest of Chris Childs for sex trafficking, Buzdum renamed TNT as The Wild Rose Gentleman's Club.

**C.     Information Provided by Victim 1**

15.     On May 16, 2017, Victim 1, an adult female, reported to HPD and DCSO that Childs was forcing her to be involved in commercial sexual activity. A short time later, Victim 1 made a statement about this conduct to me. Victim 1 reported that between October 31, 2015, and May 15, 2017, Childs regularly forced or coerced her to perform prostitution dates, most often in the "champagne rooms" at TNT and the Hardware Store, another strip club in the area. Victim 1 reported that Childs demanded that she give him all proceeds earned from prostitution dates and dancing at the strip clubs.

4

16.     Victim 1 described Childs' rules when working at the strip clubs and performing prostitution dates. Victim 1 also described additional rules imposed by Childs that governed nearly every aspect of Victim 1's life. Victim 1 described physical punishments that Childs inflicted or threatened for violating these rules, including beating her, making her sleep on the bathroom floor, choking her during oral sex until she vomited, and forcing her to insert painful objects into her vagina, such as a hot curling iron.

17.     Victim 1 explained that at the end of every night, Childs required her to bring him all of the money that she had made. Initially, Victim 1 had to drop the money off at Childs' residence every night on the way home from TNT or the Hardware Store. Miller or one of the bartenders would provide payment to Victim 1 in a sealed envelope. Later, Childs installed a safe in Victim 1's home, and Victim 1 was to lock the envelope inside the safe. If there were any discrepancies as to how much money should be inside the envelope, Childs would call the club managers to verify how many times Victim 1, and other women working for Childs, had entered the champagne room. Law enforcement later verified and documented the existence of this safe.

18.     Victim 1 stated that the owner (Buzdum), manager (Miller), and other staff of TNT were aware that Victim 1 and others were working for a pimp. According to Victim 1, the owners and managers of both TNT and the Hardware Store preferred to hire dancers who had pimps because they would work any shifts required of them, show up on time, and bring in additional high-spending clientele who wanted to buy sex in the champagne rooms. Dancers with pimps generally had a greater motivation to earn as much money as they could because of their pimps' demands, and the clubs profited from this arrangement because they took a cut from each champagne room service. The club owners and managers also knew that they could call Childs if

5

they had any problems with the women working for him and that Childs would deal with them right away.

19.     Victim 1 stated that she worked at TNT from approximately late October 2015 through February 2016. Childs introduced Victim 1 to Miller, and, after providing her ID and phone number, Victim 1 was hired as a dancer.

20.     At first, Victim 1 only danced at TNT and did not perform any "extras" or sex acts at the club. She quickly learned, however, from Childs and other dancers that the best money was earned by engaging in oral sex or intercourse in the champagne rooms. Childs told Victim 1 that she needed to start earning money this way and had Campbell teach her how.

21.     Victim 1 learned that TNT charged a $150 fee for the use of a champagne room and that this money was split between the dancer and the club. Extras were typically negotiated and paid for in cash inside the champagne room, however if a credit card was used to pay the champagne room fee, the price of the extras could be added on as a tip. These tips would be converted to cash and given to the dancers along with their cuts of champagne room and lap dance fees in an envelope at the end of each night.

22.     The champagne room fee entitled a customer to use the room with his/her dancer of choice for half an hour. When time was up, a bouncer would let them know by knocking on the door of the room.

23.     Dancers could solicit customers independently, however "dates" were sometimes arranged by TNT's bouncers. Dancers would tip the bouncers for these referrals.

24.     Victim 1 was aware of other pimps who brought in women to dance and perform sex acts at TNT. These included Childs' son, Chris Jr., and Kendrick Hayden, a/k/a "Ball." According to Victim 1, Hayden was known as a "gorilla pimp," or a pimp who primarily uses

6

violence to control his victims. Victim 1 recalled that Hayden sometimes openly beat his victims at TNT.

25. Victim 1 stated that there were cameras in the champagne rooms but they were fake, meaning nonoperational.

**D.    Information Provided by Victim 2**

26. On March 30, 2018 and April 10, 2018, case agents interviewed Victim 2. She corroborated the information provided by Victim 1 regarding how Childs treated his victims and Childs' rules. Victim 2 described how Childs controlled what she ate, what she could drink, and even when she could use the bathroom. Victim 2 also described how starting in September 2015, Childs had forced her to perform commercial sex acts, including at TNT. Victim 2 provided details of instances in which Childs beat and/or urinated on her for violating his rules. Victim 2 also described how Childs directed her to learn from Jennifer Campbell. Campbell would teach Victim 2 how to negotiate prostitution dates, how much to charge, and what to do in the champagne rooms. Campbell would also report back to Childs as to whether Victim 2 was following his rules.

27. Victim 2 had recently started dancing at the Hardware Store when she met Childs. Childs directed her to begin dancing at TNT and forced and coerced her to engage in commercial sex acts there.

28. Among Childs' rules was never to engage in commercial sex acts with black men. The first time Childs was violent with Victim 2 was due to a violation of that rule that occurred at TNT. Victim 2 and another dancer, who went by "Chastity," went into a champagne room with a black male. Chastity became uncomfortable and left, however Victim 2 gave the male oral sex in exchange for $60. Just as Victim 2 and the male were exiting the champagne room, Childs came into TNT with Victim 1 to introduce Victim 1 to Miller. Childs was extremely angry and accused

7

Victim 2 of violating his rules and having sex for free. Once they were home that night, Childs beat Victim 2, slapping her so hard that a gauge fell out of one of her ears and slamming her head into the kitchen cabinets.

29.     Victim 2 stated that the staff of TNT were aware that prostitution was taking place inside TNT. She recalled that whenever Miller had any issues with the dancers who worked for Childs, Miller would contact Childs directly to resolve them. She also remembered that Ryan Jorns, one of the bouncers at TNT, was a regular client of Victim 1.

**E.     Information Provided by Victim 3**

30.     In August 2018, case agents spoke with Victim 3. Victim 3 reported that Childs had served as her pimp for an extended period. Victim 3 described Childs' rules and his acts of physical violence toward her. Victim 3 described twice going to the police for help, and I have reviewed MPD reports regarding complaints Victim 3 made against Childs. Victim 3 also described having to go to the hospital after being beaten by Childs.

31.     Victim 3 only worked for Childs at TNT for a short period of time when it first opened in 2010. Victim 3 described TNT as more discreet than the Hardware Store at that time and less willing to allow overt pimp violence inside the club. She did state, however, that a number of pimps frequented TNT and had females working for them there, including pimps who went by "Black" and "Star."

**F.     Information Provided by Victim 4**

32.     On May 14, 2018, case agents interviewed Victim 4. Like Victim 3, Victim 4 was trafficked by Childs for several years, in her case from roughly 2004 through 2009. During this time, and for some time afterwards, Victim 4 danced at TNT. Childs first met Victim 4 at a strip club in Ripon, Wisconsin. Shortly thereafter, Victim 4 found herself stranded in Minnesota

8

without a ride back to Wisconsin. She contacted Childs, and he agreed to buy her a bus ticket so long as she would start living with him when she returned. When Childs came to retrieve her from the bus station, he revealed that he was a pimp and that Victim 4 would have to live with him and his "bottom" or longest-running victim and make money for him by dancing and performing commercial sex acts at strip clubs.

33.    Childs used force, threats, and intimidation to induce Victim 4 to dance and engage in commercial sex while following his rules. In many instances, Childs did not have to resort to physical violence with Victim 4; she was sufficiently frightened of him because he told her numerous stories of his abuse of past victims, and because she witnessed him beat and abuse Victim 3, that she usually did not challenge Childs or disobey him. On at least one occasion, however, Childs repeatedly slapped Victim 4, causing bruising, because he believed she had had sex with someone for free. Victim 4 made a police report about the incident, but Childs prevented Victim 4 from going to court to follow through with the prosecution of that incident.

34.    The strip clubs where Childs instructed Victim 4 to work were scattered around the state of Wisconsin. Childs had personal connections at most of these clubs. One such club was TNT. According to Victim 4, TNT and the other clubs where Childs took her preferred to hire dancers who had pimps. The pimps, including Childs, would make efforts to establish relationships with the owners to make sure that their victims would always have work, keeping a steady stream of dancers in the clubs. Victim 4 recalled that other pimps beyond Childs also worked girls at TNT.

35.    Beyond just turning a blind eye, Victim 4 indicated that TNT specifically allowed prostitution dates to take place inside the club. When Victim 4 first started dancing at TNT, customers would negotiate private rooms and sex acts directly with dancers and pay the dancers

9

both the room fees and the price of the so-called "extras." The dancer was then responsible for giving TNT its cut of the room fees. Later on, Tim Miller felt that dancers were lying about the number of champagne rooms they did and keeping the club's cut, so he created the system wherein the bartenders accepted the room fees at the register, and dancers were paid out at the end of the night in envelopes.

### G. Information Provided by Victim 5

36. I interviewed Victim 5 in May 2018. Other case agents also interviewed Victim 5 in March 2018 and July 2018. Childs recruited and retained Victim 5, by means of fraud and coercion, to perform commercial sex acts for him at TNT.

37. Victim 5 first began dancing at TNT in mid-2014 after she met Justin Gillis, Buzdum's stepson, at a party. At the time, she was unemployed and in need of money. Gillis suggested that Victim 5 try dancing at TNT and said he could get her a job there. Victim 5 agreed.

38. Gillis drove Victim 5 to TNT to get her signed up to dance. On the way there, Gillis told Victim 5 that she would likely meet a black male named Chris Childs at the club because he frequently hung out there. Gillis warned Victim 5 not to have anything to do with Childs because he was a pimp and a manipulator. Victim 5 listened to what Gillis had to say, but she did not think much of it at the time because she did not understand what a pimp was and did not feel that she could be easily manipulated.

39. Approximately two weeks after Victim 5 started dancing at TNT, Childs approached her one night after she got off the stage. Childs told Victim 5 that she was beautiful and began talking to her about her potential and how much money she could make if she would team up with him. He promised to help her triple her earnings and said he would buy her a car.

10

40.     Childs then told Tim Miller to open a private room for him and Victim 5.  Victim 5 felt that this was more of an order than a request to Miller and saw that Miller complied right away.  Based on this, she felt that Childs must have a fair amount of authority at TNT.  Once inside the room, Childs told Victim 5 to get completely naked so that he could "see what he was working with."  Victim 5 felt uncomfortable but did as Childs said because she was nervous about what he might do if she refused.  Childs told Victim 5 to come and sit next to him.  He told her that they were going to be the next "Coco and Ice-T," referring to a famous rapper/actor and his wife, who transitioned from stripping and pornography after Ice-T "discovered" her.

41.     From that point on, Childs had Jennifer Campbell mentor Victim 5 at TNT. Campbell would introduce Victim 5 to her regulars at TNT at arrange prostitution dates between them.  Campbell would report to Childs throughout the night about how Victim 5 was performing.

42.     One such date occurred in a champagne room at TNT.  A customer requested that Campbell perform a sexual service for him in the champagne room, and Campbell suggested that he choose Victim 5 instead.  The customer took Victim 5 into the champagne room and said he wanted to perform oral sex on her.  Victim 5 was hesitant but felt she had no choice.  She let the customer begin, but then quickly told him she was uncomfortable and wanted to stop.  The customer then asked to have intercourse with Victim 5, but Victim 5 said no.  The customer gave her $150.  When Victim 5 delivered the money to Childs, he was extremely happy with her and told her he would get rid of Campbell so that Victim 5 could be his "main bitch."

43.     Another incident took place outside of the club with a couple who frequented TNT. The couple invited Victim 5 and Campbell to come to the house after their shift, and Campbell told Victim 5 they needed to go.  Victim 5 did not understand initially that the purpose of the visit was for prostitution.  Once at the house, everyone undressed and went into the hot tub naked

11

together. Afterwards, they went upstairs to the couple's bedroom where Campbell asked Victim 5 to join in a foursome. Victim 5 told them she did not want to have sex because she was on her period as an excuse to get out of it. Victim 5 tried to lie on the edge of the bed, but the other three still groped and kissed her. At the end, she and Campbell were each given $300. All of the money went to Childs.

44.     Victim 5 stated that everyone who worked at TNT knew that Childs was a pimp and treated him with respect because of his status there. Victim 5 also said that TNT's owner was well aware that prostitution was taking place in the champagne rooms at TNT.

45.     Victim 5 and Campbell were treated differently than the other dancers at TNT because they worked for Childs. When they arrived at the club to worker, bouncers would come to carry their bags and valet their car. They did not have to pay the house fee or tip out the bouncers and bartenders at the end of the night like the other dancers did. They were given free drinks while they worked, even though Victim 5 was only 19 and Miller had made a copy of her driver's license.

46.     According to Victim 5, Childs and Miller were very close and talked regularly. Miller contacted Childs directly about his girls' scheduling, and Childs always made sure that Campbell and Victim 5 were scheduled to work together.

47.     Seeing how Childs was treated at TNT made Victim 5 feel that Childs was very powerful. She also feared him because he would warn her that she did not want to see his "dark side." Childs made Victim 5 contact him before and after each champagne room service she did so that he could approve the price she had negotiated. He only allowed Victim 5 to have money to get her hair and nails done so that she could continue to bring more money in for him. Childs controlled the personal details of Victim 5's life, such as whether she shaved her pubic hair or

12

what phone she used. He made her choose between having a baby with him or being branded with his name and the word "loyalty" on the back of her neck. Victim 5 chose the tattoo.

48. On one occasion, Childs coerced Victim 5 into attempting to insert a full can of soda into her vagina. Victim 5 was completely humiliated. Thereafter, she felt that she no longer controlled her own life; Childs did. Victim 5 was only able to leave Childs after a court-ordered residential program issued an internal no-contact order between her and Childs.

### H.     Facebook Conversations

49. Information obtained through the execution of search warrants for Facebook records for Childs, Campbell, Victim 1, Victim 2, and Victim 3 corroborated the victim statements described above. For example, Childs received and sent photos and memes related to being a pimp, engaged in conversations in which he confirmed that he takes all of the money earned by his victims, discussed his rules, and sought to recruit women. In March 2014, Childs told a woman in a private Facebook conversation that he had been a pimp for more than 18 years.

50. The Facebook materials included communications between Childs and Victim 1 and Victim 2. Two examples illustrate the content of the Facebook materials:

    a.    In a conversation on August 6, 2016, Childs directed Victim 1 to torture herself as "punishment." Childs told Victim 1 that she must sleep with a bottle inserted into her rectum for 3 weeks and that she had a week to force her fist into her vagina. When Victim 1 told Childs that trying to stick the bottle into her rectum "hurts so bad," Childs responded, "I want it to hurt."

    b.    In a conversation on November 13, 2015, Victim 2 stated that she wanted to return Childs' phone and "be done" working for him. Childs told her, "You're not done" and "Don't make me come find you." Childs stated he would never let her leave, noting that he put too much "work and effort into you to let you just walk away." Childs stated that Victim 2 could not become a "lost investment" and added, "I'm not gonna let you fuck up my plans." When Victim 2 countered that there was nothing Childs could do, Childs replied, "There's a lot I can do and if you'd like me to show you I will." Childs further warned Victim 2 not to "underestimate" him. Childs

13

then asked if Victim 2 wanted to leave because Victim 1 had begun working for him. Victim 2 begged Childs to "replace" her with Victim 1 and let her leave "peacefully." Childs stated that he was "getting real pissed off" and told Victim 2, "You are my property."

## I.    Information Provided by S.B.

51.    In April 2018, I interviewed S.B., who had been identified as a long-time prostitution customer of Jennifer Campbell. S.B. indicated that he had met Campbell at the Hardware Store and had been paying her for sex for approximately 4 years. S.B. explained that he would purchase champagne rooms at the TNT and the Hardware Store so he could have sex with Campbell. S.B. would pay the club approximately $175 for 30 minutes or $250 for an hour to use the rooms. S.B. indicated that there was an additional $10 fee for using a credit card.

52.    In addition to paying for sex with Campbell, S.B. purchased the residence in which Campbell and Childs resided and purchased a Cadillac for Campbell. Case agents have verified that S.B. is listed as the owner of the residence that had been shared by Childs and Campbell.

## J.    Information Provided by CW-1

53.    In October 2017 and August 2018, case agents interviewed CW-1. CW-1 had worked at TNT and its predecessor club, the Roadhouse, from approximately 2009 through 2017. In August 2017, Buzdum terminated CW-1 and Miller.

54.    CW-1 had dropped out of high school at age 16 in order to watch some of the club's dancers' children while their mothers worked. CW-1 was also paid to clean the club in the morning before it opened.

55.    When Buzdum converted the Roadhouse into TNT, he took out a number of small booths that had curtains and replaced them with the larger champagne rooms, which had real doors. According to CW-1, this was so that dancers could more easily and discreetly perform commercial

14

sex acts in the champagne rooms, thus bringing in more business for the club. At that time, Buzdum also had Paul Dorsey, his brother-in-law, install cameras throughout the club, including in the dancers' locker room. The only areas of the club that did not have cameras were the bathrooms and the champagne rooms.

56.     Even without being in the club during operating hours, CW-1 understood that prostitution was taking place inside the champagne rooms, because she would find condom wrappers, as well as used condoms, wet wipes, and tissues on the floors of these rooms when she would clean. From time to time, CW-1 would call an all-staff meeting before the club opened and exhort the dancers to clean up after themselves.

57.     CW-1 said that although no one spoke openly about the sex acts occurring in the champagne rooms, everyone who worked at or patronized TNT knew what was going on. CW-1 stated that Buzdum knew because he personally paid the club's dancers to engage in sex acts with him. CW-1 gave examples of several dancers whom she knew Buzdum regularly paid for sex, including Jennifer Campbell. According to CW-1, Buzdum routinely came into TNT intoxicated and continued to drink while there. Buzdum would have Miller set up dancers for him to have sex with and instruct Miller to have the bartenders pay the dancers from the club's till.

58.     CW-1's understanding was that Buzdum's wife, Dawn Buzdum ("Dawn"), had filed for divorce from him in 2015 after nearly catching him having sex with a dancer at TNT. After that occurrence, Buzdum would contact Miller and ask him to bring dancers form TNT to his apartment above the Dew Drop Inn for a couple of hours at a time. Buzdum also instructed CW-1 to buy a cell phone for club use. CW-1 and Miller were to use this phone to underreport TNT's nightly totals to Dawn. These artificially low totals were based solely on the TNT's credit

15

card earnings rather than its total sales. Buzdum did not want Dawn knowing about the cash sales, and he did not report any of the cash income on his taxes.

59. Beyond his involvement setting up prostitution dates for Buzdum, CW-1 said Miller knew prostitution was occurring at TNT because he established relationships with pimps like Childs who brought their girls to work there. CW-1 explained that Miller was under pressure from Buzdum to grow the business by any means necessary. Miller took TNT from a club that earned very little money to a successful establishment that often made $18,000 a week or more by courting pimps to bring their girls there, and encouraging a clientele that included drug dealers, gang members, and men looking to pay for sex. Miller established pimp-friendly policies, such as not requiring the dancers who worked for Childs to tip out the bartenders and bouncers at the end of a shift. If Childs ever had an issue with how TNT was treating him or his dancers, Miller and Childs would negotiate an agreement or understanding. CW-1 said that Buzdum knew there were pimps operating at his club but did not care.

60. After CW-1 turned 19, she began bartending and helping to keep TNT's books. Lap dances, champagne rooms, money from the till (bar), door fees, and dancer fees and fines were all tracked using a tally system in a series of notebooks. After Miller lost one set of notebooks, CW-1 started keeping a double set.

61. According to CW-1, TNT kept as much as $20,000 in singles on hand in the club. CW-1 used to get these singles from her bank, but they eventually told her that she required more cash than they could conveniently provide her. If an exchange of bills over $10,000 was needed, Miller made the exchange at the Bank of Lake Mills. CW-1 believed that the owner of Bank of Lake Mills' son, Ty (known to me as Ty Neupert), may have invested in TNT.

16

62.     CW-1 explained that customers paid at the bar for champagne rooms but negotiated sex acts privately with the dancers and paid them for those services directly once inside the champagne rooms.  Customers could charge any amount they desired on a credit card and receive any amount over their tabs in cash.  This cash could then be used to pay for sex acts.

63.     CW-1 learned what a pimp was early on, when she went to her first TNT staff barbecue and saw Childs and "Ball" (Kendrick Hayden) each bring multiple dancers with them. Over time, she became familiar with other pimps who brought dancers to work at TNT, including one who went by "Spider."  The dancers who worked for pimps would sometimes come into work with injuries.  CW-1 remembered that Ball split the cheek of a dancer who went by "Sixxx" in 2012 or 2013, and that other times she would come in with bruises.  Another one of Ball's girls, who went by "Callie," once came in with a split lip.  Likewise, women who worked for Childs, such as Campbell and Victim 1, sometimes came in with a split lip or a bruise.

64.     The dancers tried to hide their injuries with makeup, but those who worked at the club could easily see what had happened.  Although they did not speak about these incidents openly, dancers would talk quietly amongst themselves about them.

65.     Ball had a particular reputation for violence among TNT's staff and dancers.  Ball used to come to TNT during operating hours to supervise his dancers, but Miller eventually created a rule that pimps were not allowed to hang out in TNT because they were inciting problems between the pimp-controlled dancers and the independent dancers.  After several years, Ball beat Sixxx so badly that Miller and CW-1 convinced her that she needed to leave Ball.  Sixxx lived with Miller and CW-1 for a time and worked as TNT's "house mom," coordinating the dancers' schedules.

17

66.     CW-1 believed that the women working for Childs did not have any choice about whether they worked at TNT each night. Victim 1 would often complain to CW-1 that she was exhausted working double shifts and just wanted to go home. CW-1 believed Victim 1 was only working because Childs demanded that she do so.

67.     CW-1 understood that Childs used Campbell as his eyes and ears inside the club to keep control over Victim 1 and Victim 2. CW-1 could tell that Victim 1 and Victim 2 felt on edge around Campbell. They were unusually quiet in her presence, especially in Campbell was in a bad mood. They knew that Campbell would report anything that they did or said back to Childs. On several occasions, CW-1 saw Victim 1 and Victim 2 give Campbell their pay envelopes.

68.     Campbell used to have a lot of sugar daddies at TNT who would regularly give Campbell money and buy things for her. Over time, they learned that Campbell had a pimp. Even though Campbell would deny to them that Childs was their pimp, they would eventually become convinced that he was and complain about it to CW-1 and others.

69.     CW-1 recalled that while she was bartending, Childs and Ball would sometimes instruct her or the other bartenders not to make any alcoholic drinks for one of their girls even if they ordered one. According to CW-1, they would sometimes make drinks for these dancers in spite of the pimps' instructions because they felt sorry for them having to live and work under the pimps' control.

K.     **Information Provided by CW-2**

70.     On October 31, 2017, I interviewed CW-2. CW-2 worked as a bouncer at TNT from the time he was 18 (approximately 2015) through the summer of 2017, when he was terminated along with Miller and CW-1.

18

71.     During his tenure at TNT, CW-2 witnessed acts of violence that occurred at TNT between pimps and the women who worked for them.  CW-2 said that on at least one occasion, he had to physically remove Childs from TNT because CW-2 had seen Childs physically assault Jennifer Campbell.  CW-2 also saw Ball physically assault Sixxx.

**L.     Information Provided by CW-3**

72.     On August 13, 2018, case agents interviewed CW-3, who had danced at TNT for a time in 2014.  CW-3 recalled that Childs used to come to TNT nearly every night at that time.  After CW-3 had been dancing at TNT for about three weeks, Childs approached her and tried to recruit her to work for him.  Campbell likewise tried to pursue her to join their "team."  CW-3 declined.

73.     CW-3 said that after about three months of dancing at TNT, she learned that other dancers were making much more money than she was by engaging in sex acts with customers in the champagne rooms.  CW-3 began to do the same.

74.     CW-3 recalled that Buzdum was a frequent prostitution customer in his own club and had certain dancers whose company he preferred, including Campbell.  CW-3 said that Miller once set up a date between CW-3 and Buzdum in a champagne room and paid her for the anticipated sex act.  Buzdum was too intoxicated to perform, but he still gave CW-3 a tip.

**M.     Information Provided by Joseph Jenrich**

75.     Joseph Jenrich reached out to FBI Special Agent Heather Wright in August 2018, saying that he had been hearing a lot of rumors about TNT since the arrest of Childs and that he wanted to "set the record straight."  SA Wright interviewed Jenrich on August 28, 2018.  Jenrich had worked as a bartender for Buzdum for approximately ten years, first at the Roadhouse and then later at TNT.  Jenrich quit shortly after Miller was fired in August 2017.

19

76.     Jenrich stated that many of Buzdum's current and former employees, not only from TNT but also from his other establishments, did not like Buzdum. Jenrich gave the example of a bartender from the Dew Drop Inn who was fired because she refused Buzdum's sexual advances. Jenrich also stated that Buzdum had a habit of smacking the backsides of his female bartenders. Furthermore, Jenrich said that Buzdum would frequently come to TNT drunk and take dancers into the champagne rooms to have sex with them, even when his stepsons were at the club.

77.     Jenrich described how, when Buzdum turned the club from the Roadhouse into TNT, he took down the curtains that used to divide the champagne rooms and instead installed doors. Later, locks were installed on the doors. Jenrich believed this was done to ensure customer privacy during private dances. According to Jenrich, there were no cameras in the champagne rooms. This was different from the rest of the club, which had cameras installed throughout.

78.     Jenrich admitted that customers at TNT were always talking about dancers performing sex acts in the club and how much these services cost. Jenrich stated that on the few occasions when dancers were caught blatantly performing sex acts a few times, they were fired. Jenrich also stated, however, that certain customers were routinely allowed to run their credit cards at the bar in order to receive cash back most likely used to pay for sex acts in the champagne rooms.

79.     Jenrich would sometimes hear dancers saying things like that they had to run off to "daddy," which he understood to mean they had to get home to their pimps. Jenrich was aware of several pimps who operated at TNT. He said that one went by Ball and had dancers named Sixxx and Satin working for him. This pimp used to frequent TNT until Sixxx stopped working for him. Jenrich recalled that Satin later worked for another pimp, Spider, who also brought his girls to TNT. Spider had a "bottom" named Ciara, and Ciara recruited a TNT dancer whom Jenrich had

20

formerly dated to work for Spider. This dancer called Jenrich crying and saying that Spider had thrown her on the ground, branded her on her neck with a tattoo, and told her she was going to Atlanta to prostitute for him.

80.    Jenrich said he remembered that Childs would come into TNT when Jennifer Campbell, Victim 1, and Victim 2 were working. He stated that he never thought Childs was a pimp because Childs and Campbell were "older." Nevertheless, he also remembered how Miller had instructed then-bouncer Jake Maroo to help Victim 2 escape from Childs.

81.    According to Jenrich, Buzdum had pushed Miller hard to bring in more dancers and make more money. Following Childs' arrest, Buzdum claimed that everything that happened at TNT was Miller's fault because Miller encouraged business from the wrong crowd. Buzdum was also saying he had no idea Childs was a pimp. Jenrich pointed out, however, that Buzdum played poker with Childs once a week at the Dew Drop Inn. Jenrich believed that Buzdum had to know why Childs frequented TNT.

N.    **Information Provided by Ryan Jorns**

82.    On March 29, 2018 and October 16, 2018, case agents interviewed Ryan Jorns ("Jorns"), who was then working part time as a bouncer at TNT. Jorns was familiar with Childs as a pimp from both of these locales. Jorns could not recall having seen Childs inside TNT or the Hardware Store but said he often saw Childs in the parking lots of these clubs.

83.    Jorns had been a regular client of Victim 1 and paid for sex with her on numerous occasions through December 2016. Jorns was aware that Victim 1 and Campbell worked for Childs and that they conducted prostitution dates outside of the clubs. Jorns initially stated that Victim 1 and Campbell "possibly" also did dates inside the champagne rooms at the clubs. He later admitted to doing prostitution dates with Victim 1, as well as another dancer, inside TNT.

21

84.     Jorns was also aware that Childs was violent with the women who worked for him. Jorns had heard from these women that Childs would sometimes painfully squeeze the backs of their necks to get their attention while they were inside the clubs, but he would do it in such a way that an observer would think he was just giving them a neck massage. He also knew that Childs would sometimes call Miller to say that Campbell would not be coming in to dance at TNT for a few days and that this would signify that Childs had beaten Campbell.

85.     Jorns recalled an incident in January 2017 when the Hardware Store's manager told Jorns to take Victim 1 home because she had come to work high. Jorns took Victim 1 inside Victim 1's home, where she passed out on her bed. Jorns then fell asleep on Victim 1's couch. Later, Jorns was awakened by the sound of Victim 1's phone ringing repeatedly, followed shortly thereafter by the sound of Childs pounding on Victim 1's back door. Victim 1 urged Jorns to exit through the front door, and Jorns did so without encountering Childs. Jorns believed that Childs had come inside Victim 1's house after Jorns was gone and either "scolded or beat" Victim 1.

86.     Jorns believed that Miller was formerly a pimp in Chicago before becoming the manager at TNT. According to Jorns, if a dancer who worked at TNT had a pimp, and the pimp knew Miller, Miller would report to the pimp how much the dancer had earned thus far in the night.

**O.     Information Provided by Jacob Maroo**

87.     On March 29, 2018, I interviewed Jacob Maroo ("Maroo") in connection with this investigation. Other case agents also interviewed Maroo on April 10, 2018. Maroo had worked on and off as a bouncer at TNT for approximately seven years. He stated that he quit in the fall of 2016 because there were lots of gang members and shady characters frequenting TNT, and he feared there would be a shooting. After Miller was fired in August 2017, Maroo agreed to come back on board as TNT's manager. Maroo is presently employed by Buzdum in that capacity.

22

88.     Maroo described Buzdum as a "good guy" and "family-oriented." Later, however, he described how Dawn, Buzdum's wife, had caught Buzdum having sex with one of TNT's dancers in a champagne room at TNT. He also admitted to driving dancers to Buzdum's apartment above the Dew Drop Inn for a few hours at a time.

89.     Maroo stated that Buzdum pays him every two weeks. He receives his pay as $592 via check and $900 in cash. According to Maroo, Buzdum suggested splitting Maroo's pay this way so that Maroo and his then-pregnant wife and children would continue to qualify for public benefits. Maroo said that Buzdum personally signs all of TNT's payroll checks and drops them off on Tuesdays or Wednesdays. Maroo is also regularly paid cash bonuses of anywhere between $40 and $290 a night, depending on the night of the week.[1]

90.     As a part of his job responsibilities, Maroo tracks TNT's income from the register, room fees for the lap dance room and champagne rooms, and house fees from the dancers each night. At the end of the night, Maroo places the reports of these sources of income into a safe located behind the bar. Maroo has also been keeping a second set of books since November 2017, which he stores in his car.

91.     Maroo stated that TNT has two safes and that the bartenders all have the codes to the safes. He said that they may contain as much as $10,000 total at any given time. If the club was running low on cash during business hours, Maroo says he would go to Buzdum's house (**N9661 Boje Court**) and retrieve additional cash that was stored in Buzdum's van. I know Buzdum to own a 2014 Blue Toyota Sienna Sport Van with VIN 5TDYK3DC0ES454630 and Wisconsin tag 181VZN.

---

[1] Case agents have verified, based on 2018 Wisconsin Department of Workforce Development reporting, that TNT had only paid Maroo a total of $12,527 by check through the third quarter of the year.

23

92.     According to Maroo, TNT's business was approximately half in cash and half in credit. Customers who want to use a credit card to get cash can do so at the bar for a 10% fee. TNT also has an ATM that is serviced by a private company.

93.     Maroo said that he sent both Buzdum and Dawn text messages to their phones with TNT's sales figures each night at 10 p.m., midnight, and closing. Maroo also said that Dawn used to come into TNT on Sunday nights to do a weekly inventory. At that time, Dawn would pull tapes from the point of sale system and place them in the safe. Maroo said he used to run a separate copy of TNT's income reports for Dawn that was placed in the liquor cabinet at the bar, however Dawn told Maroo in April 2018 that she no longer needed her own reports.

94.     Maroo was aware that Buzdum and TNT use the Bank of Lake Mills as their primary financial institution. He believed that Buzdum knew someone there. Maroo stated he did not have signature authority on TNT's bank accounts, however he was given a credit card with which to buy pizzas, water, soda, and other supplies for TNT. Since Maroo has been managing TNT, most of TNT's bills have been mailed to the Dew Drop Inn. Maroo indicated that Buzdum's main office is in the basement of the Dew Drop Inn.

95.     According to Maroo, Buzdum normally drops off TNT's employee payroll checks at the club on Tuesdays or Wednesdays. Buzdum also comes to TNT every day between 9 a.m. and noon and places a green bag in the primary safe with money for the cash register.

96.     Maroo stated that TNT has five champagne rooms, each large enough to fit a couch and a table. Maroo estimated that the champagne rooms are used six to eight times on weeknights, eight to ten times on Thursday nights, and about 14 times on the weekends. Maroo was aware that TNT currently charges $250 for the use of a champagne room for 30 minutes, or $175 for 15 minutes. He stated he has heard that dancers can earn $100-300 in additional "tips" from

24

customers inside the champagne room. Maroo believed these tips were in exchange for sex acts, though he claimed to have no direct knowledge or confirmation of this.

97.    Although there were cameras all over TNT, which Maroo attributed to Miller being "paranoid," there were no cameras in the champagne rooms. The cameras elsewhere in the club could be monitored in real time from Buzdum's house.

98.    Dancers were given a cut of the room fees they had brought in for TNT at the end of each night in an envelope. Maroo said Miller had previously seen Campbell and Victim 1 taking money out of their own envelopes and hiding it. Maroo understood that Campbell, Victim 1, and Victim 2 worked for Childs, whom Maroo saw at TNT while Maroo was a bouncer there. He further understood that Campbell was Childs' "eye and ears" when Childs was not at TNT, and that she would report back to Childs about what the other girls who worked for him were doing.

99.    Maroo observed that the women who worked for Childs came in with bruises "a lot more often than not." He recalled seeing Victim 1 with multiple bruises and seeing Victim 2 with a black eye. Maroo helped Victim 2 hide from Childs after one such occasion. Victim 2 told Maroo that Childs was raping her in an effort to get her pregnant so that she could not leave him.

100.    Maroo said Victim 1 and Victim 2 frequently talked about leaving Childs while they worked for him. They would try to save toward that goal by hiding it, however one would usually end up telling Childs about the other's plans in order to protect herself. Maroo also remembered Campbell talking with Miller about wanting to leave Childs. Campbell, Victim 1, and Victim 2 would discuss the rules that Childs imposed on them, such as not doing "extras" with black men.

25

101.    Maroo believed that Childs' violence toward his victims went in cycles. He stated that the victims would "misbehave" for a bit, that they would "learn their lessons," and that the bruising would subsequently stop for a time before the cycle began again.

**P.    Information Provided by Justin Gillis**

102.    Justin Gillis, Buzdum's stepson and Dawn Buzdum's son, is currently a defendant in a criminal case in this district and has been charged with multiple Hobbs Act robberies. Case agents debriefed Gillis concerning his knowledge of facts relevant to this investigation on July 24, 2018 and August 1, 2018.

103.    Gillis worked as a bartender and bouncer at TNT's Clyman location from the time he was 18 (in 2007) through October 2008. Gillis also worked at TNT's current Lebanon location and at the Dew Drop Inn from March 2013 until sometime in 2014 or 2015. Gillis reported that Buzdum fired him over personal disputes concerning Gillis' girlfriend.

104.    Gillis stated that TNT's employees were paid every two weeks, and payroll was done at Buzdum's house. Each pay period, Buzdum gave Gillis a bag with cash in it to pay the cash portion of the employees' wages. The amount of cash in the bag was always different, but it was usually between $1,500 and $2,000. Gillis said that Tim Miller, CW-1, and Lewis Miller were paid via a combination of cash and check. All of the bouncers were paid solely in cash and were paid at the end of each shift.[2]

---

[2] Case agents have reviewed the quarterly reports that Buzdum submitted to the Wisconsin Department of Workforce Development to document the wages paid to Tequila Nights, Inc.'s employees from 2013 through the third quarter of 2018. They noted that none of the former TNT bouncers of whom law enforcement is aware, including Russ Klein, Haley Radtke, Paul Dorsey, Joseph Jenrich, Ryan Jorns, Jason Berke, James Miller, Amadee O'Gorman, Erik LNU, Luis LNU, and Henry LNU, appear in any of these quarterly reports. Additionally, Tequila Nights, Inc. only reported Jacob Maroo's wages (that is, the portion paid by check) after Maroo began managing TNT in 2017; he was not listed in the reports during the years when he was a bouncer.

26

105.    According to Gillis, it was common knowledge that prostitution was available with dancers in TNT's champagne rooms.  The idea was that the champagne rooms were supposed to be used for private lap dances and include an inexpensive bottle of champagne, however Gillis stated that very little champagne was ever served at TNT.

106.    Gillis further stated that the reason his mother was divorcing Buzdum was because Buzdum himself was paying for sex with TNT's dancers.  Gillis described how Buzdum would frequently come to TNT drunk, sometimes with his brother or an entourage of friends, and use the largest private room in the back of the club.  Buzdum would have a dancer or group of dancers brought into the room for him or him and his friends to have sex with.  Dawn had discovered this practice and made a recording on her phone of Buzdum having sex with one of the dancers.

107.    Gillis said that Miller was often responsible for brokering Buzdum's paid sexual encounters.  Miller once set up such a "date" for Gillis, however Gillis was too intoxicated at the time to perform.  Gillis said that sex acts were generally negotiated and paid for directly between customers and dancers inside the champagne rooms.

108.    Gillis stated that the practice of allowing and encouraging prostitution in TNT's champagne rooms stemmed largely from Miller taking over as manager and being pressured by Buzdum to improve TNT's bottom line.  Miller began recruiting pimps, including Childs, Ball, and others, to bring their girls to dance at TNT.  In time, almost all of TNT's dancers, even those who did not have pimps, were performing sex acts for money inside the club.

109.    Gillis explained that the promotion of prostitution brought in both additional clientele, who were specifically interested in exchanging money for sex, and additional money directly to the club, in the form of champagne room fees. The champagne rooms were used almost

27

exclusively for sex acts, allowing TNT to charge a fee substantially higher than that ordinarily charged for lap dances. This fee was paid to the bouncers and split between TNT and the dancer.

110. Gillis got to know Childs from seeing him at TNT. He noticed that Childs was treated with special respect. Childs did not have to pay for anything he wanted at TNT. Childs and other pimps were often allowed inside TNT before it opened for the evening and after the club closed for the night. Gillis recalled an instance where Miller even instructed Maroo to fill Childs' gas tank with money from TNT's till.

111. Childs was very vocal about being a pimp and told Gillis that he had been a pimp for a long time. Childs bragged that Campbell alone made him $1,500 to $2,000 per night. Gillis did remember Campbell as one of the top-earning dancers at TNT and said that she had bought Childs a Hummer with the money she made from selling sex there. Childs also told Gillis that if TNT's bouncers arranged dates for Campbell, Campbell would kick them back some money.

112. It was Miller who first told Gillis that Campbell was Childs' "bitch." Gillis said he seldom saw Campbell at TNT without Childs being there too. One night, after closing, Gillis observed Childs and Campbell arguing and saw Childs strike Campbell. When Gillis asked Miller about the incident, Miller said it was because Campbell had gotten drunk and lost her money. When Gillis later told Buzdum about it, Buzdum replied, "That's Tim's [Miller's] department."

113. I showed Gillis a photograph of Victim 5. Gillis recalled meeting her through a workout buddy and arranging for her to audition at TNT. Gillis also remembered that when he brought Victim 5 to TNT, he saw Childs there and warned Victim 5 that Childs was a pimp and a manipulator. Gillis told Victim 5 that she should stay away from Childs. Later, Victim 5 stopped talking to Gillis when he came to TNT, and Gillis learned that Victim 5 was "messing with" Childs.

28

According to Gillis, Miller relayed a message to him from Childs that Gillis should not speak to Victim 5.

114.    Childs told Gillis that his son, Chris Jr., was also a pimp and that Chris Jr. was trying to recruit Sixxx to work for him. Gillis knew that Sixxx had previously worked for a pimp known as Ball. Gillis said Ball also controlled other TNT dancers, including "Callie" and "Brooklyn."

115.    Ordinarily, Ball would not let his girls near Gillis because Gillis was not buying sex. Gillis recalled a time when he paid for a lap dance from Callie. In the lap dance room, Callie began crying and telling Gillis that she wanted to get away from Ball. Gillis shared this with Miller, and Miller later helped Callie to leave Ball. Despite this apparent altruism, Gillis says Miller would frequently talk to Gillis about how he could send Gillis dancers to "manage" if he wanted to "get into the business."

116.    Gillis believed that ever since his mother, Dawn, first filed for divorce from Buzdum, Buzdum has been trying to hide money from Dawn. Gillis opined that if Buzdum were to use one of his family members to hide money, it would be Dusanka "Diane" Buzdum, Radomir Buzdum's sister. Gillis stated that when things first went bad between Buzdum and Dawn, Buzdum stopped using the safes at the Dew Drop Inn (because Dawn had access to them) and started hiding the money elsewhere. Gillis stated that Dawn once told him she had seen a text message on one of Buzdum's phones saying that Buzdum was giving his brother, Boromir Buzdum, $100,000.

117.    Gillis also believed that when Boromir was going through bankruptcy several years ago, Buzdum may have put one of Boromir's businesses into his own name and held onto approximately $70,000 in cash for Boromir so that Boromir would not lose the money in the

29

bankruptcy proceedings. Gillis based this on conversations that he says he overheard between Buzdum and Dawn, as well as things that Dawn would relate to Gillis directly.

### Q.  Information Provided by Dawn Buzdum

118.  On November 13 and 14, 2018, other case agents and I interviewed Dawn Buzdum, Radomir Buzdum's estranged wife. Dawn married Buzdum in 2003. At the time of her marriage to Buzdum, she already had two sons from a prior marriage, one of whom is Justin Gillis. Dawn stated that she and Buzdum are currently in the midst of a divorce stemming from, among other things, her discovery that Buzdum was paying for sex with dancers at TNT.

119.  Dawn described various bars and restaurants that Buzdum had owned and run in Wisconsin and in Florida when they were first married. She stated that Buzdum eventually sold one of these establishments, a Mexican restaurant called Tequila Nights, and used the proceeds to buy the property in Lebanon, Wisconsin, where TNT was later established. At first, Buzdum operated that property as a supper club that he called Buzdum's. Buzdum's had a three-bedroom living space below it, and Dawn and Buzdum lived there for a time. The supper club, however, did not make much money. Buzdum then opened a bar that he hoped would be more profitable, the Dew Drop Inn.

120.  Dawn stated that Buzdum leased the supper club property in Lebanon to several different lessees, culminating with "Pauly" (known by law enforcement to be Paul Deangelis). Deangelis leased the property with an option to buy and later turned the business from a supper club into a strip club called the Roadhouse. Dawn indicated that Buzdum assisted with this process.

121.  Dawn reported that around 2005-2006, Buzdum also opened his own strip club in Clyman, Wisconsin, in the building where the Hardware Store strip club currently operates. He

30

called the strip club the TNT Gentleman's Club. Dawn was involved in auditioning and hiring dancers, ordering liquor, and tracking TNT's finances. Dawn said she would even host monthly parties for TNT's dancers, giving out gift cards to those with the highest sales totals, and offering them help with things like obtaining a GED or signing up for various social services. Dawn recalled that Buzdum initially spent a lot of time at TNT. Once things were off the ground and running smoothly, he gradually went less frequently, mainly stopping by to pick up and drop off money.

122. According to Dawn, approximately two years after TNT opened in Clyman, Don Raffaelli and Michael Siegel approached Buzdum about selling TNT's building. They purchased it from Buzdum and opened their own strip club there, the Hardware Store.

123. Dawn explained that Deangelis defaulted on his lease of the Roadhouse in Lebanon. Buzdum then took control of the property and transformed it into a new incarnation of the TNT Gentleman's Club. Miller, who was then the manager of the Roadhouse, was made manager of TNT. Buzdum gave Miller great authority over TNT. He had a credit card to make purchases for TNT, the combinations to all of the safes at TNT and the Dew Drop Inn, control over the gambling machines at both establishments, and full access to Buzdum's home.

124. Dawn said that when Buzdum reestablished TNT in Lebanon, he began to cut her out of the business. He told her that she would only be doing inventory for the club, and he later instructed club employees not to let her in the door during business hours. Dawn started to hear troubling reports from some of the dancers, such as that Miller demanded oral sex from them in order to work at TNT. According to Dawn, many of the original TNT dancers refused to dance at the new TNT because things had changed.

31

125.   Buzdum kept current with profits from TNT and other clubs he was involved in by requiring texts from the managers twice nightly informing him of sales. Dawn said that for years, Miller would text Dawn and Buzdum with the number of dancers working, the amount in the till as of 9 or 10 p.m., the number of champagne rooms paid for, and the number of lap dances paid for.[3] One night, Dawn saw a text on Buzdum's phone with nightly numbers for TNT and realized they were different than the numbers she had been texted. Dawn confronted Buzdum, who told her she was crazy. Dawn later discovered, however, that any cash received in connection with lap dances and champagne rooms was not added to the till but went straight into Buzdum's pocket.

126.   Dawn described how Buzdum "flipped a switch" in 2013. He began drinking excessively and became verbally abusive toward Dawn. He sometimes threatened to stab Dawn or to put a bullet in her head (while handling a gun). He also began taking Dawn's name off of legal paperwork concerning their assets. He would tell Dawn that she had a bad credit score and that he could get better interest rates by himself. He began hiding money and other assets with the help of his siblings so that Dawn would not have access to it.

127.   Dawn suspected that she was not being given accurate information about the businesses' sales. In early 2018, Dawn paid to have a point of sale (POS) system installed at TNT so that she could get a more accurate picture of their finances. In May or June 2018, Buzdum instructed the employees not to use the POS systems and to use other cash registers instead. Dawn believed, however, that the POS still had a running total of all sales before use of it was

---

[3] Following Dawn's interviews, and with Dawn's assistance and consent, agents accessed Dawn's iCloud account. Among the items of evidence recovered from Dawn's iCloud account were numerous text messages from Tim Miller to Dawn with sales numbers from TNT. Case agents also found a photo of the screen of another phone capturing a text message dated May 2 of an unknown year at 12:07 a.m. The message appeared to be from CW-2 and read, "Hello Rad the 11:00 numbers are 567 till, 4 lap dances, and 1 champagne room." I know Rad to be the nickname of Radomir Buzdum.

32

discontinued, and that this total had not been zeroed out. Dawn said that the Dew Drop Inn had had a POS system since 2013 or 2014. The gambling machines at the Dew Drop Inn are connected to the POS system as well.

128.　Dawn said she recalled Buzdum bragging that his video gambling machines at the Dew Drop Inn made him $50,000 to $60,000 in one particular month. When going through a digital forensic report of Dawn's phone, I located a video that shows Dawn talking with Buzdum. Dawn asks Buzdum if the machines make $50,000 to $60,000 a month, and Buzdum replies that the previous month they made him $19,000.

129.　Dawn gave me records showing past cash payouts made by the Dew Drop Inn for customers' winnings from the gambling machines there. Dawn stated that Buzdum did not report the income from his gambling machines on his tax returns. In addition, Dawn has since provided case agents with an email dated June 25, 2018 in which Buzdum was attempting to negotiate a settlement of financial issues related to the divorce. In the email, Buzdum told Dawn to change a reference to the gambling machines to simply state, "revenue" because the "machines are illegal."

130.　By 2014, Dawn also began to suspect that prostitution was taking place at TNT and that this was the reason why Buzdum was trying to keep her out of the club's business. Dawn stated she had overheard Buzdum and Miller talking about prostitution and pimps. Buzdum tried to keep Dawn from overhearing their conversations on that topic, but Dawn heard Buzdum say that he wanted Miller to keep the pimps from hanging out at the club.

131.　Dawn believed that Buzdum was well aware that Childs was a pimp. She stated that Childs played poker each week at the Dew Drop Inn and that Buzdum sometimes joined these games. She explained that Buzdum did not want Childs to be seen inside TNT, however, because he was a pimp. Dawn recalled that on one occasion, Gillis had traded cars with Childs for a week.

33

Buzdum was upset about Childs' Hummer being parked in their driveway (**at N9661 Boje Court**) during that week because he did not want a "pimp's car" being seen in front of his house.

132.   Dawn also observed during a visit to TNT that multiple small VIP rooms with locking doors that been added, and that there were no surveillance cameras in these rooms. Elsewhere in the club, however, TNT had a network of surveillance cameras that Dawn was able to monitor on her phone. Dawn added that the recordings from these cameras are not recorded over and that they are typically retained, however Buzdum has two different systems at TNT so that he can be selective about what he wants to turn over in the event of a request from law enforcement.

133.   In May 2015, Dawn filed for divorce from Buzdum.[4] Pursuant to a court order that Buzdum vacate their home, Buzdum moved into the apartment above the Dew Drop Inn. Dawn had been receiving reports from her son, Gillis, and one of the bouncers' wives that Buzdum was paying TNT dancers for sex. Dawn also began noticing, when she would view the surveillance cameras at TNT (which she and Buzdum could do on their phones), Buzdum would sometimes disappear from view in the back of the club. One night, Dawn went to TNT to find out where Buzdum was going when he was off camera. Right after she saw Buzdum go off camera, she drove to TNT. She discovered that there was a clandestine way for Buzdum to access the large VIP room in the back of the club that was not visible on camera. Dawn entered the room and found Buzdum inside with a naked dancer. Dawn recorded a video, which she turned over to me, that begins a few moments after Dawn walked into the room. In the video, Buzdum has his shirt

---

[4] Dawn later stipulated to a dismissal of her petition for divorce in January 2016 because she ran out of money. Later in 2016, she and Buzdum jointly refiled for divorce. Dawn stipulated to a dismissal of that petition in November 2016 because she was battling a serious illness and felt that she did not have the physical stamina or the financial means to continue with the divorce. Buzdum moved back into their **home on Boje Court** in 2016 to assist Dawn with her medical issues. Dawn and Buzdum jointly filed for divorce again in June 2018.

34

off, and the dancer is getting dressed. Dawn tells Buzdum that she caught him "red-handed," and the dancer says she only gave Buzdum a naked lap dance. When Dawn asks why the dancer's face was in Buzdum's crotch during the "dance," no one replies.

134. After Dawn filed for divorce, dancers told her that Buzdum had made Miller and CW-1 threaten to fire them if they told Dawn about what Buzdum was doing at TNT (paying dancers for sex). They also told her that Buzdum had been saying he would leave her "penniless" after their divorce.

135. Around that time, a dancer contacted Dawn and arranged to meet her at Mayfair Mall. The dancer provided a video of Buzdum negotiating sex for money with two dancers. Dawn turned a copy of this video over to me, as well as additional videos that capture her meeting with the dancer. The video the dancer gave Dawn depicts a shirtless Buzdum negotiating payment with two dancers, one of whom is visible and the other whose voice can be heard.

136. Dawn also downloaded video recordings from her home Nest camera system. In one video, which Dawn played during her interview, Buzdum and a friend discuss going to TNT to select dancers to have sex with. In the course of her interview, Dawn also consented to agents downloading the content of her iCloud account, which contained these and other videos involving Buzdum.

137. Dawn stated that Buzdum has told her that he takes "pills" recreationally. Dawn knows Buzdum to store some of these pills inside a toothpick holder in his pocket and to dispense them to golfing buddies who complain of aches and pains. Dawn said that Miller obtained the pills for Buzdum. Dawn also noted that Buzdum sometimes used "some kind of opiate" and that she had heard from others that he uses cocaine. According to Dawn, however, Buzdum's principal

35

drug of choice was alcohol, and it was not uncommon for Buzdum to drink 1.75 liters of alcohol by himself.

138.    Dawn explained that in 2015, just before she filed for divorce, she was shocked to learn that she and Buzdum owed the government over $200,000 in unpaid taxes. Dawn stated that she tried on several occasions to talk with their accountant, Daniel Sanft, about it, but that Buzdum would insist on going to see Sanft with her and would dominate the conversation. Buzdum also prevented Dawn from seeing any of the tax return paperwork that he had her sign and was very secretive with their mail at the **Boje Court home** so that Dawn would not discover notices indicating that he had not been paying their taxes.

139.    Meanwhile, in spite of Buzdum's repeated claims that they did not have money to pay off their tax debt, Dawn saw that Buzdum spent exorbitant amounts on his personal desires. Dawn reported that Buzdum took expensive golf vacations to California and had an estimated $700,000 in renovations made to **the house on Boje Court** in 2017. The improvements included new gas fireplaces, a new swimming pool, a complete remodeling of the garage and kitchen, new televisions and speakers, new furniture, and the installation of what Buzdum described as the "Cadillac of hot tubs" on the back deck. Dawn showed me recent emails wherein she and Buzdum argue about the propriety of these expenses.

140.    Dawn stated that Buzdum previously used BMO Harris for both his personal and business banking. After BMO Harris took issue with Buzdum cashing numerous payroll checks, Buzdum transferred the accounts to the Bank of Lake Mills. Dawn stated that Buzdum is friendly with Ty Neupert, the owner's son.

141.    Dawn was aware that both TNT and the Dew Drop Inn did a large portion of their business in cash, and that Buzdum did not deposit all of this cash into the bank. Dawn stated that

36

she had seen Buzdum with shoeboxes full of cash at their home in 2015. On one of these occasions, Dawn said Buzdum asked her if she had ever seen that much cash before at one time. Dawn replied that she had not. Buzdum then told her that she never would again.

142.    Dawn knew that Buzdum kept cash in five safes in various locations around the Dew Drop Inn, including in the basement and behind the bar. She also stated that as of the time she moved out of their house located at **N9661 Boje Court in Watertown** in August 2018, they had two safes, one of which was anchored to the floor of the bedroom closet, and the other of which was in the garage. Dawn was aware of two safes that had been upstairs at TNT, but she said Miller took them with him when he was terminated. She also knew of another in TNT's basement but said it was very old and no one knew the combination for it. Additionally, Dawn knew that Buzdum kept cash stashed under the front seat of his minivan.

143.    Dawn indicated that Buzdum's office was located in the basement of the Dew Drop Inn. This is where the sheets used to track lap dances and champagne rooms from TNT are kept, along with the moneybags from TNT. Dawn said that Buzdum does not have a computer either at home or in the office and instead uses his phone to keep track of income and expenses. Dawn reported that Buzdum's cell phone is (920) 248-3360, which law enforcement has verified from other information obtained during the investigation. Dawn stated that Buzdum stores receipts at the Dew Drop Inn in the basement, the mudroom, or one of the unattached garages.

144.    Dawn expressed concern that Buzdum may be attempting to conceal assets (primarily cash) at his brother Boromir Buzdum's bar in Germantown, Buzdums Pub & Grill. According to Dawn, whenever one of the Buzdum siblings has a legal problem that could affect their assets, it is common for them to hide cash and other assets with the other siblings. For example, Dawn said that when "Diane" Buzdum, Radomir Buzdum's sister, was getting divorced

37

in 2011, Radomir hid $30,000 in cash for Diane in hopes of keeping it from her ex-husband. Dawn herself opened a safe deposit box, at Buzdum's instruction, to conceal this cash.

145.    Dawn stated that when she moved out of **the home on Boje Court** on or about August 1, 2018, she took Buzdum's iPhone. Dawn provided the phone to case agents. The phone is described as a black iPhone Model A1660, FCCID: BCGE3085AIC579C-E3085A. Dawn indicated that the phone is not password-protected and that her brother disabled a feature that would allow the phone to be wiped remotely. Dawn indicated that there are texts, photos, and other forms of information regarding Buzdum's activities on the phone. Law enforcement placed the phone on inventory but has not sought to access the content of the phone pending this warrant application.

**R.    Information Provided by Timothy Miller**

146.    On September 20, 2017, having been fired from TNT in August, Tim Miller reached out to the Dodge County Sheriff's Office to offer information about Buzdum and TNT. Miller stated that Buzdum had fired him due to recent events at TNT, including a shooting that occurred in the parking lot there on August 2, 2017. Buzdum had promised him $25,000 in severance pay, only $9,000 of which had been paid at that point. Miller indicated that on one occasion, while he attempted to negotiate the terms of his severance with Buzdum, Buzdum placed a gun on the desk between them in order to intimidate Miller.

147.    Buzdum had also attempted to get Miller to sign a nondisparagement contract and to return TNT's books, which Miller had taken with him, in exchange for additional severance pay. Miller stated that Dawn Buzdum had separately offered him an additional ten percent if Miller would deliver TNT's books to her instead. Miller declined these offers.

38

148.    From September 20 until December 14, 2017, other case agents and I interviewed Miller on five occasions.  Case agents also had contact with Miller several additional times, including to provide assistance with contacts regarding State unemployment claims.  Miller was compensated $800 for his information regarding Buzdum and TNT.

149.    Miller said that he originally began working for Buzdum as a bouncer, and then a manager, at the Roadhouse.  When the Roadhouse closed, Miller filed for unemployment benefits. Buzdum offered to keep Miller on and give him a managerial position when he reopened the Roadhouse as TNT.  Miller continued to collect unemployment for several months while working at TNT.  During this time, Buzdum paid Miller $100 cash per day.  Once Miller could no longer collect unemployment, Buzdum began paying Miller $15 an hour for 40 hours per week, half by check and half in cash.  Miller indicated that Buzdum did this in order to avoid paying unemployment insurance.

150.    Miller was aware that Buzdum refused to pay other employees, including CW-1, by check for similar reasons.  Former bartender Lewis Miller (no relation to Tim Miller) was the only employee paid entirely by check.  Employees who received paychecks used to pick them up at TNT or at Buzdum's home.  According to Miller, however, they now pick them up at Sanft Accounting.

151.    Miller recalled that former bouncer Russ Klein had broken his ankle while working at TNT.  Buzdum offered Klein a decent sum of money if Klein would file his workers' compensation claim through his other employer, which Klein did.  Buzdum, however, never paid Klein what he had promised.

152.    Over the years, Buzdum put increasing pressure on Miller to make TNT profitable. Miller said Buzdum paid him a $1,000 cash bonus for every thousand dollars that TNT made over

39

the weekly target of $9,000. Miller stated it was not unusual for TNT to make $15,000-$16,000 per week while he was manager.

153.    Originally, Dawn Buzdum did TNT's bookkeeping using two laptop computers. Miller later took over when, according to Miller, Dawn got sick of being involved with TNT. Miller kept four separate notebooks that tracked different sources of income at TNT, including the till (bar), tip out collected from the dancers, the lap dance room, and the champagne rooms. Miller said that after he once lost one of the notebooks, he had CW-1 start transferring everything in them into a single master notebook but never finished.

154.    According to Miller, lap dances cost $25 per song. Of that amount, the dancer received $15, and TNT received $10. A champagne room cost $200 per girl for a 30-minute rental, and a "mini champagne room" cost $150 per girl for 15 minutes. The dancers and TNT split the champagne room fees evenly.

155.    Miller explained that fees collected from the dancers were tallied in the tip-out notebook. If a dancer arrived when the club opened at 7 p.m., she paid $10 to dance. For every thirty minutes after 7 p.m., a dancer would have to pay an additional $5, up to a maximum fee of $40 to dance. Miller remarked that Buzdum "wanted money from everyone."

156.    There was not a notebook for tracking cover charges. Cover was $5 on weeknights and $10 on weekends. Miller said he often let customers in without charging cover, however TNT still made around $800 per week in cover charges, which he and Buzdum split.

157.    Income from TNT's gambling machines was not tracked in a notebook either. Miller said that the machines at TNT and the Dew Drop easily make $10,000 to $15,000 per week, however Buzdum does not report this or any other cash income on his taxes. It used to be Miller's

40

responsibility to collect cash from the gaming machines each night, however Buzdum now does this himself.

158.    Miller stated that cash revenues from TNT were deposited into zippered compartments inside the door of a gun safe in the basement of the Dew Drop Inn. Miller stated that there was no predictable pattern to how cash was kept there. One day there might be as much as $80,000-100,000 inside the safe, and the next it might be empty.

159.    Miller said that if the money was not brought to the Dew Drop Inn at the end of the night, it was brought directly to Buzdum at **his home on Boje Court**. Miller had the combination to a safe at Buzdum's home. If Buzdum was not home when Miller brought the money (although he usually was), Miller would let himself in and deposit the cash into the safe or leave the money in a bag underneath the front seat of Buzdum's minivan. Miller also stated that CW-1 would sometimes bring the money to Buzdum's home the next morning in an envelope.

160.    Miller indicated that when Buzdum and Dawn were negotiating their divorce in 2015, Buzdum stopped keeping cash at home or at the Dew Drop Inn, moving it instead to his brother Boromir's bar in Germantown, Buzdums Pub & Grill.

161.    Miller stated that Buzdum wanted as few assets in his name as possible during the divorce. For this reason, Buzdum titled a van owned by TNT for picking up dancers and club supplies, as well as a Chevy pickup truck, in Miller's name. Miller now believes Buzdum also did this in order to avoid liability in the event of an accident or lawsuit.

162.    According to Miller, Buzdum told him that he did not go through with the first divorce because he wanted additional time to "tie up some loose ends" and conceal assets in order to come out better financially.

41

163.    Miller recalled that Buzdum would make false claims of business expenses on his taxes in order to reduce the amount he owed. According to Miller, Buzdum would have him go to office supply stores and purchase blank invoices. These invoices would be filled out to document fictitious expenditures for improvements to TNT. Miller said he actually spent approximately $25,000 of his own money on construction materials for improvements to TNT because he believed that one day he would be part owner of TNT with Buzdum.[5] Buzdum never reimbursed Miller for these materials, but he did use Miller's receipts to support his own tax write-offs.

164.    Miller used to pay TNT and the Dew Drop Inn's bills by check using one of four checkbooks for accounts held in Buzdum's name at BMO Harris Bank. Miller also made cash deposits on Buzdum's behalf at BMO Harris and the Bank of Lake Mills.

165.    Miller stated that everyone at the Bank of Lake Mills knows Buzdum and that Ty Neupert, the owner's son, has a personal financial interest in TNT. Miller believed that Neupert had bought into TNT and was paying for club advertising in the form of billboards in Fort Atkinson. Miller said that in September 2017, he overheard Buzdum tell Neupert, "Don't worry; you will make money once we get this shit taken care of."

166.    Miller stated that Buzdum regularly paid dancers at TNT for sex. If Buzdum still owed these dancers money at closing time, Buzdum would have Miller pay them from the club's till. When Buzdum lived in the apartment above the Dew Drop Inn, Buzdum would also have Miller drive TNT dancers there to have sex with him.

167.    According to Miller, Dawn found out about Buzdum's infidelities through her son, Justin Gillis. Dawn then began offering dancers money to record themselves having sex with

---

[5] Miller stated Buzdum had promised him 10% of TNT when he became manager but never delivered.

42

Buzdum and bring the evidence to Dawn. Miller recalled that one dancer, a minor, took Dawn up on this offer. When Buzdum learned that this minor had a recording of him having sex with her, Buzdum ordered Miller to seize the minor's phone. Miller said he did so. Miller stated that Buzdum hired several minors and got fake IDs for them so that they would appear to be of legal age to dance at TNT.

168. Miller admitted that the champagne rooms were supposed to be for lap dances; however, "other things" went on there. The club took a cut of all champagne room fees, but any other proceeds from the sexual activities that occurred within a champagne room were considered "extra" and negotiated directly between the dancers and the customers.

169. Miller was reluctant to say that TNT sponsored prostitution occurring in its champagne rooms. He did, however, name several dancers known for engaging in prostitution at TNT or working for pimps, including Childs and Ball. According to Miller, Ball denies being a pimp, but Miller believes he is because he often travels to Atlanta and talks about how many pimps are there. Miller also described the women who worked for Ball as "all beat up." He also recalled an instance in which he saw a dancer give a $30,000 tip she had received from a client to Ball.

170. Miller said the last time he spoke to Childs was when Childs accused Miller of not paying "Jada" (Jennifer Campbell) her champagne room fees. Miller reviewed TNT's surveillance cameras and observed Campbell taking money out of her envelope and hiding it in her shirt. Miller told Childs what he had seen.

**S.     Information from Tim Miller's Phones**

171. On March 9, 2018, the Watertown Police Department arrested Miller for Stalking and Second Degree Sexual Assault of a Child under Watertown Police Department Case 18-386.

43

These offenses were unrelated to this investigation into Childs and TNT. When officers made contact with Miller, they located two iPhone cell phones in his vehicle.

172. On March 12, 2018, the Watertown Police Department obtained a search warrant for the phones, and on April 11, 2018, the phones were imaged by Detective Wacker of the Watertown Police Department. During Detective Wacker's review of the phones, he noted that the phones contained information pertaining to TNT's operations. Detective Wacker made the following observations:

a. Most contacts in the phones were saved with "TNT" before their names.

b. Miller was using the phones to make contact with dancers or other proxies to schedule the dancers or confirm how much dancers were owed or had earned on a given night.

c. There were multiple deleted text messages that Detective Wacker was not able to recover. Among them were messages exchanged with a number saved in the phone as "Rad," Buzdum's nickname.

d. The phones contained several photographs of females, some of whom appeared to possibly be minors, dressed in attire meant for stripping. Based on the context, it appeared likely that these females were dancers at TNT.

173. On June 28, 2018, the Honorable Judge Nancy Joseph issued a federal search warrant for Miller's phones. I have reviewed the digital forensic reports that resulted from the searches. In the results from the examination of Miller's iPhone 8, I found numerous contacts that began with "TNT." I also recognized contact information for Victim 2, as well as a single, shared contact entry for both Victim 1 and Jennifer Campbell. There were many other "TNT" contacts, including four saved as "TNT COCAINE." Chris Childs was also saved as a contact.

174. I also noted some texts that appeared to be from a bartender at the Dew Drop Inn that included nightly figures for sales at the Dew Drop. There was also a message from Miller to

44

Buzdum and Paul Dorsey informing them that the drawer at the Dew Drop Inn was short one night and that Miller was unable to determine the cause of the discrepancy.

175.    Additionally, I found an exchange concerning dancer scheduling that took place on September 14, 2016 with a contact saved as "TNT CIARA NEW." Based on the names used and the context of the conversation, I believe Spider and Ciara to be the pimp and "bottom" duo whom Joseph Jenrich described.

| | |
|---|---|
| Miller: | Yo bring those 2 girls plus white girl today right |
| Ciara: | Me ND shi today. My other girl had something to do today |
| Miller: | K ty |
| Ciara: | running late |
| Miller: | Hurry plz got 2 girls here |

Two days later, on September 16, 2016, they exchanged the following messages:

| | |
|---|---|
| Miller: | Yo got any xtra bitchs to bring wit u LOL |
| Ciara: | Lol not right now |
| Miller: | Just b in time ty baby n tell spider I say what up n ty |
| Ciara: | Spider said don't worry |
| Ciara: | I will be on time |
| Ciara: | Put me down all week Spider said |
| Miller: | Ty |

**T.    Information from Post-Arrest Search of Childs' Phone**

176.    Following his arrest on March 29, 2018, the FBI downloaded the content of Childs' cell phone. Among the contacts saved in Childs' phone were entries for:

    a.   [CW-1]

45

b. Sixx

c. Tim ( Roadhouse ) with a phone number of 920-253-6391

177.   I also found several text message conversations that concerned TNT.  One such conversation took place on December 26, 2017 between Childs and a contact saved as "Williams deetrah idgt." From the context of their conversation, it appears Williams is a former TNT dancer who, at the time of their conversation, had gotten sober and had just completed a nursing degree. In relevant part, they wrote:

| | |
|---|---|
| Williams: | U been to the club lately |
| Childs: | Tnt?? |
| Williams: | Yea |
| Childs: | Nope,jake bitch ass kicked me out |
| Childs: | Cuz I was fuckin his wife |
| Williams: | 😊😊when he come back |
| Williams: | Who's who's wife |
| Childs: | They fired Tim and now jake runs it |
| Childs: | [Victim 2] |
| Williams: | Watttt |
| Williams: | Tim ain't the manger no more |
| Childs: | Nope |
| Williams: | Who the fuk is [Victim 2] |
| Childs: | And he moved out |
| Williams: | Wattt |
| Williams: | Omg yea i been a longgg time 😊😊 |

46

| Williams: | Whose the manger now |
|---|---|
| Williams: | Does wat the fuk dude name fukkk I can't think rite now rad that's it does he still own the club |
| Childs: | [photograph] |
| Childs: | That's [Victim 2]. |
| Childs: | And jake runs it now |
| Williams: | Oh wow |
| Williams: | Watttt |
| Childs: | And rad still owns it |
| ... | |
| Williams: | How's fuk I can't think of names |
| Williams: | Lil buddy |
| Childs: | Who?? |
| Williams: | Yo right hand guy |
| Childs: | Ball |
| Williams: | Yasssss |
| Williams: | Omg I miss him |
| Williams: | ☺☺☺☺☺ |
| Childs: | That nigga good |

178. Additionally, I found the following text conversation from September 19, 2017 between Childs and Miller:

| Miller: | Yo what's up bro I need to talk to you when you available |
|---|---|
| Childs: | Where you at?? |

47

| | |
|---|---|
| Miller: | I'm living at club still but yep all BS |
| Childs: | You still down stairs?? |
| Miller: | YES BUT NOT FOR LONG WRU N WYD |
| Childs: | At hardware playing poker |
| Miller: | Who bartender tonight |
| Childs: | Bill |
| Miller: | Idk abt him what u think he say I come up there |
| Childs: | Want me to find out?? |
| Miller: | I need to talk to him n Mike some time too |
| Childs: | I can meet you over there after poker |
| Childs: | Or tomorrow at dew drop |
| Miller: | No not here or dew |
| Childs: | Ok |
| Childs: | Silk ?? |
| Miller: | There why bill has issue with me |
| Miller: | Idk why I talk to Mike when ever we see each other just mutual respect same Damm business lol I got no issues with anyone or anything |
| Miller: | WTF happened to u |
| Childs: | What you mean |
| Miller: | U ask bill lol |
| Childs: | Yeah, he said he had to talk to Mike first |
| Miller: | Ok can you ask mike to call me tonight tomorrow plz |
| Childs: | I just texted him |

48

179.    I also identified numerous text conversations from late 2015 through early 2018 between Childs and Paul Dorsey, Dawn's brother.   From the tenor and content of these conversations, it appears that Childs and Dorsey are friends and play in a weekly poker game together.  They frequently joke with one another and talk about happenings at TNT.  Some of their discussions include:

a.    Childs asks Dorsey to talk to Tim for him about a camera system he has for sale and about scheduling a dancer named Champagne.

b.    Dorsey complains that Maroo is trying to drive him out of TNT.  Childs suggests that Dorsey convince all the dancers to quit so that Maroo will be driven out instead.

c.    Dorsey asks Childs about a customer he thinks is a regular of Campbell's. Childs replied that the customer used to be a regular of Victim 1's and used to spend good money, but he was exhibiting stalking type behavior toward Victim 1.  Childs says he made Victim 1 get a restraining order against the customer.  He says he saw the customer at the Hardware Store and that the customer could not look Childs in the eye.

## U.    Overview of Law Enforcement Contacts with TNT

180.    During the course of my investigation into Childs, TNT, and the Hardware Store, law enforcement responded to TNT for two incidents that I learned about.  The first was a sexual assault.  On August 1, 2017, the Portage Police Department responded to the home of a 20-year-old female who had cut her wrists and was expressing suicide ideations.  Officers asked the young woman why she had cut herself.  She explained that she was a dancer at TNT and had been working during the overnight hours between July 28 and July 29, 2017.  She stated that she was highly intoxicated and agreed to have sex with a customer in a back room at TNT.  After the customer penetrated her vaginally, she told him that she did not want to continue.  The customer replied that it was "already happening" and continued having sex with her.  The victim tried waving her hand under the door to attract attention, but no one noticed her.  She then tried pushing the customer off,

49

but he held her down by her wrists until he finished, ejaculating on her chest. The responding officers noted and documented bruises to the inside of the victim's thighs, which she indicated were from the incident.

181.    During the sexual assault victim's interview, she denied engaging in prostitution at TNT during this incident or otherwise, however she stated that prostitution commonly took place in the champagne rooms there. According to the victim, Tim Miller and the other staff of TNT knew that prostitution was taking place inside the club, and this was the reason there are no cameras in the champagne rooms. The victim also stated that she had seen Miller giving dancers condoms in the back of the club near the vending machines. She recalled a specific instance in which, as she was headed back to a champagne room with a client, she saw Miller hand the client a condom. The victim explained that TNT keeps half of all champagne room fees paid.

182.    When the sexual assault suspect was interviewed, he stated that the victim had asked him if he wanted to go into a champagne room with her and indicated to him that there were no cameras. He admitted to paying $200 for the use of the champagne room for 30 minutes and to having sex with the victim, but he claimed that the sex was not an act of prostitution and was consensual.

183.    The second incident was a shooting that took place in the early morning hours on August 2, 2017. When Dodge County Sheriff's Office deputies arrived on scene, they found Tim Miller outside with a flashlight. Miller told the deputies, "There was these black guys in here and these guys claim they got shot." Miller added that the males told him they needed an ambulance but ended up leaving in an Audi and a Durango. The two victims were later identified at a hospital in Madison. The area was canvased and law enforcement recovered brass firearm casings,

50

suspected blood, two cell phones, a path of trampled grass, and an uprooted fencepost with barbed wire attached to it on the south side of the TNT property and in the field behind it.

## V.     Online Reviews of TNT

184.     As part of this investigation, case agents researched online reviews of TNT. Reviews on a website called USASexGuide.com, which offers reviews of locations where prostitution is available and descriptions of individual sexual encounters, suggested that exchanges of sex for money are widespread and accepted at TNT.

185.     Two frequent posters regarding TNT as of late 2016 and early 2017 were "Eagle19" and "DaveDream." On January 8, 2017, Eagle19 wrote,

> Went to TNT tonite Saturday January 7th, OMG what a f'and line up, as usual AA WOMEN a little aggressive, but yo ujust tell them you came there to c someone else & they'll back off. But what a great line-up, 2 stars in Luna whitec& hispanic very sexual hot spinner, great personality, very spun KY with pierced nipples & clit. She cuts hair during the day, dances on saturdays, her fantasy is to give a man a hair cut & teasing him during the hair cut, then wen done she wants to strip naked & have wild ruff sexfor more info pm Me. About 5 other pretty hot white girls some taller some shorter but very nice, I love petite spinners, my favorite was also there but sorry I'll keep that one to myself nice warm fat kitty on this little spinner, amazing heat coming out of thatvmuffin, she's the one I spent most of the night, probably the best one there, no tats, very sexy, petite young hot spinner, great conversation, all around great girl. TNT definitely the place to go on Fri & sat. On a side note everything goes, you just have to find out which one does what you want, because not all does all, but not hard to an amazing HE. Good luck out there boys & plan a trip out there.

DaveDream posted the following reply to Eagle19 on January 9, 2017:

> I went to TNT on Friday night and have been there over a dozen times the last 5-6 months. I've talked to the owner and most of the bouncers. I also know most of the girls and they know who I am. Your post sounds like a different club. Or made up bs. On the weekends around 11:30 p-midnight, mostly AA men come in and take over the far end of the club. They buy bottles of liquor and ask for sinlges as the give the bartender a 100 bill. (Make it rain) ThE ladies love it! I usually leave at this time. Yes, everything goes there but 15 min in the back will set you back 150 plus a tipe the the guy who watches the camera and a 40 tip to the girl before the action starts. 30 min is 200 + tips. Wayyy overpriced for what you get...

51

Eagle19 responded to DaveDream the same day, writing,

> I was there Saturday,8 til about 11:30,if stayed on the floor because your right after you go in back you can get over 300.00 real quick I agree, I totally stayed on the floor & had kitty heaven. I played with this little blond, on the floor tipping her, she had no problem with me moderately playing with the kitty, very warm & moist..." "I'm long gone by bar time, so if it gets that AA late I wouldn't kno, maybe their the dealers pimps or bf's. Good luck hope this helps & enjoy.

DaveDream replied again:

> Give us a name? Nova? Lucky? (always drinks too much that she gets guys to buy for her) Probably the best set of legs and ass are on Sixx. She's worth the trip out there in itself. She hardly gets up on the stage because she has her regulars but when she does, she can work the stripper pole. I'm saving my money to take her in the back to get a BJ and tap that doggy style. My birthday present to myself

Besides Eagle19's comments about about the dancers' dealers, pimps, or boyfriends, other posts suggested that TNT's clientele were aware that some of the dancers worked for pimps. On March 31, 2018, a user named BigTen posted a link to an article about Childs' arrest for Human Trafficking that discussed his relationship with TNT and the Hardware Store. A user named Midwt2006 replied, "I've known about this guy for a while. Not surprised he was busted."

**W.    Letter from Property Owner Near TNT**

186.    I reviewed a letter received by the U.S. Attorney's Office in May 2018 and written by a homeowner whose property is very near TNT. The homeowner wrote to complain that the area had been going downhill since the strip club opened and to urge law enforcement action against TNT.

187.    The writer described concerning activities taking place at and around TNT that the writer had observed, overheard, or heard about from other neighbors, including drug deals in TNT's parking lot or areas off-camera down the street, shoot-outs, racing cars, and a drug overdose death. The writer explained that this affected all of the neighbors in varying ways. The writer

52

stated that one neighbor was in the military and frequently away. While he was gone, customers from TNT would walk through his yard, and he would find used condoms on his lawn when he returned. Another neighbor had a very difficult time selling her home and was eventually forced to sell to a registered sex offender for $40,000 under asking, prompting an inquiry from the County.

188.    The writer had noticed over time that many of TNT's dancers were dropped off by men driving expensive cars, such as Mercedes, BMWs, Cadillac SUVs, and Lexus. The writer had also seen dancers accepting money from customers outside of TNT in the parking lot.

## X.    Radomir Buzdum's and Tequila Nights, Inc.'s Tax Returns

189.    Pursuant to an *ex parte* order, case agents have obtained Buzdum's personal tax returns, as well as the tax returns for Tequila Nights, Inc. (the corporation behind TNT and the Dew Drop Inn) for 2013 through 2016. Case agents have compared these returns with the ledgers of TNT's income kept by Tim Miller and CW-1. According to these ledgers, Buzdum underreported his gross receipts for Tequila Nights, Inc. by a minimum of $261,520 for tax periods 2014 and 2015.

190.    Since the ledgers only contained partial data for tax years 2013 and 2016, it is unclear exactly how much Buzdum underreported for those years. Based on projected annual gross receipts alone, which case agents have calculated by taking the weekly average for what was recorded, Buzdum underreported his income from TNT by a total of roughly $80,517 in those two years.

191.    Furthermore, the numbers in the TNT ledgers do not account for any gross receipts for the Dew Drop Inn, so any profits from the Dew Drop Inn in any of those years would constitute additional unreported income. The ledgers (and, by extension, Buzdum's tax returns) also do not

account for profits from any of the video gambling machines at TNT or the Dew Drop Inn, cover charges from TNT, or the house fees paid nightly by TNT's dancers.

192. An additional analysis was done comparing Tequila Nights, Inc.'s Form 1120 filings with financial records obtained from banks where Buzdum and Tequila Nights, Inc. maintain accounts. This showed a discrepancy of $873,185 from 2013 through 2016 between what Buzdum reported on his tax returns and what he deposited into his bank accounts.

**Y.     Information from Recorded Conversation with Radomir Buzdum**

193. I am aware that in late 2015 and early 2016, a Confidential Human Source ("CHS") working under the direction and control of the FBI made recordings directly with Buzdum. The CHS recently completed his/her cooperation in several unrelated matters and now is available as a witness against Buzdum.

194. I believe CHS to be reliable and credible for several reasons. First, CHS consistently has provided information to the FBI for over three years. Second, CHS has been under federal indictment and cooperating for sentencing consideration. Third, the information CHS has provided is substantially against CHS's own financial interest. Fourth, law enforcement has corroborated the information provided by CHS through consensually recorded conversations and other investigative activity.

195. During a recorded conversation with CHS, Buzdum spoke about his frustration over the amount he owes each year in taxes. Buzdum stated that he hated owing the government $200,000 every year and that he no longer had business losses to offset that amount. Buzdum said his "little strip club in Lebanon" (TNT) currently was making between $11,000 and $13,000 a week, but that he reserved some of the cash that came in for himself and his manager.

54

196.    Buzdum also spoke about his own activities at TNT.  He indicated that he would sometimes drink too much and not remember things he said to people.  Because of this, Buzdum explained that TNT's manager looks out for Buzdum with "the broads."  For example, the manager might tell Buzdum in the morning that the manager had given a dancer $150 or "whatever he had to do" in order to keep Buzdum out of trouble.  In reference to dancers, Buzdum stated that "they are all fucking whores now," meeting clients outside of the club for sex.  He marveled that Mike Siegel and the Hardware Store were making $150-175 per sex act performed by the dancers and that they had an unbelievable number of "tricks" out in the middle of nowhere.

197.    Buzdum further explained during the recorded conversation, that he avoided the risk of being caught facilitating acts of prostitution by making sure that there were no cameras and getting the "right kind" of manager.  Buzdum further explained that strip club owners could avoid undercover sting operations by instructing the dancers to grab customers' crotches as soon as they go into the back rooms.  Buzdum stated that if a customer allows a dancer to grab his crotch without objection, he must not be a law enforcement officer because law enforcement cannot participate in sex acts.

198.    During the recorded conversation, Buzdum stated that come to TNT from both Lebanon and Milwaukee and, just like in Las Vegas, anything goes in the back rooms.  Buzdum expressed his belief that the dancers at TNT were all having sex in the back rooms now because they wanted money to buy heroin.

Z.    **Information from Recordings of Conversations Between Buzdum and Undercover Agents**

199.    Following Childs' arrest and the negative publicity for TNT that accompanied it, Buzdum sought to divest himself of what he viewed as a financial liability and listed TNT/the Wild

55

Rose for sale. The IRS put together an operation wherein an undercover agent presented himself as a potential buyer and met with Buzdum to discuss the club's business model and finances.

200. The first meeting between Buzdum and the undercover agent took place on October 30, 2018. Buzdum arrived at TNT to meet the undercover agent in his Toyota Sienna minivan. As the conversation got started, the undercover asked what kind of fees the club earned from the dancers. Buzdum stated that dancers had to pay a nightly fee to work there. He also explained that TNT gets half of everything the dancers bring in with the exception of their tips. For example, TNT takes half of the fee for the use of a private room. According to Buzdum, private room fees are the biggest moneymaker for a strip club. Buzdum bragged that dancers come from as far away as Chicago because they can earn good money at TNT.

201. When the undercover asked about TNT's financial health, Buzdum repeatedly stated that the club could make a lot more money than it currently does with "the right kind of manager." Buzdum lamented that TNT used to do four times the business that it does now but that the manager at that time was "a little dirty," sold drugs, and "stole too much."

202. During the course of their conversation, the agent asked Buzdum if his desire to sell was motivated by the negative press he had seen concerning TNT. Buzdum responded that the press had to do with a "black son of a bitch" whom he did not know at all, who "had some white ladies." Buzdum opined that this had nothing to do with human trafficking but instead was just a guy with "a couple of whores" whom he told, "Go make me money, bitches, cause I'm too lazy to work." According to Buzdum, this was the only problem that TNT had ever had. Buzdum claimed that none of TNT's neighbors have ever complained about TNT because there is nothing to complain about.

56

203.    Buzdum proceeded to offer several more gratuitous comments about prostitution at TNT. He stated that there are 16 cameras set up around the club and that he routinely watches the feed from home. He said there also used to be camera monitors in the basement apartment when the former manager lived there. Buzdum stated that the cameras were there to ensure that no prostitution is taking place at TNT. Buzdum also stated that the only rule at TNT is "no sex." He said that TNT plays every kind of music except for rap, because too much rap music is about "hoes," and it is degrading. Buzdum continually emphasized keeping control over the club, not allowing pimps in, kicking "that garbage" out, understanding "everything is cameras," and "no sex; just remember that, always."

204.    Buzdum told the undercover agent that it was strange to him that four months after Childs was arrested, "the other club" (the Hardware Store) was "popped with some black girl doing a 64-year-old guy in a room." What Buzdum could not understand was why the dancer would admit to receiving $100 in exchange for the sex act. According to Buzdum, the dancer could have insisted that they were just having some fun, and then it would not have mattered.

205.    During the tour of the property, Buzdum showed the undercover agent the basement living space. He remarked that everything stays upstairs because they "don't want the cops downstairs."

206.    The undercover agent asked Buzdum about TNT's monthly profits. Buzdum claimed that it was hard for him to know because he was not intimately involved in the club's business. Buzdum stated that he was an absentee operator. He claimed that he has not been inside TNT during its operating hours in over three years. At another point, Buzdum said he had been out of the day-to -day operations of the business for ten to fifteen years. Buzdum stated that all he

Case 2:19-mj-00021   Filed 02/08/19   Page 58 of 65   Document 1

did was pick up the club's money, pay taxes on it, then put the rest straight in the bank to pay bills from it.

207.    The undercover agent asked Buzdum about payroll. Buzdum said that his current manager is on the payroll so that he "qualifies for disability," which Buzdum said is very important. Buzdum explained that if employees are not on payroll, the State has a lawyer who will come after you. Buzdum stated that the agent cannot cheat the system or screw around. He summarized by stating, "If you're gonna do this, do shit by the book."

208.    The undercover asked Buzdum to see some of TNT's financial records on a future visit. Buzdum said that it would only be possible to see combined records for TNT and the Dew Drop Inn because he keeps them together. When the undercover specifically asked to see records from when the dancers "go in the back," Buzdum refused, saying, "I don't care about that. It doesn't matter." Buzdum stated, however, that he still has "everything," such as TNT's register receipts.

209.    Later, the undercover arranged to meet the current manager, Jacob Maroo, and to sit down with Buzdum to talk more specifically about TNT's finances. The undercover and a second agent returned to TNT on December 12, 2018, and met with Maroo. Maroo discussed the club's revenues and his ideas for how it could be run more profitably. Maroo stated that TNT "used to rock pretty good" but that they had been having problems getting dancers and customers to come consistently lately. Maroo stated people were afraid to come to the club because of "all the stuff that's been going on."

210.    The undercover agents asked Maroo about how much business the club was doing in cash versus by credit card. Maroo said it goes back and forth, but the club does a lot of its business in cash. According to Maroo, he tries to run a cash bar to keep things simple. Maroo

58

said the credit card machines were slow and slowed down business. Maroo explained that customers could pay for champagne rooms by credit card but that he altered the amount charged so as not to raise the credit card companies' suspicions that the club was letting customers use their cards to get cash advances. For example, if a champagne room were booked for $200, TNT charged a markup of 10% for a total of $220. Maroo would run the customer's card, however, for $199.95 so that it appeared to be a sale. Maroo stated that whole numbers looked more suspicious.

211.    Maroo explained the fees for lap dances and champagne rooms. In an attempt to get more business in the lap dance room, Maroo recently lowered the cost of lap dances to $20, split between the dancer and the club. Maroo stated that champagne rooms still cost $200 for 30 minutes and include two drinks. The champagne room fees are also divided evenly between dancers and the club. Maroo said that the club used to offer a less expensive "mini" champagne room of only 15 minutes, but it was not a popular option. Now it is only used if a customer is trying hard to haggle with the champagne room price.

212.    During a tour of the club, Maroo showed the undercovers the office and the monitors for the club's cameras. Maroo stated that cameras had recently been added to the champagne rooms and that this had caused a dip in champagne room sales. Maroo stated that in order to adequately monitor what was going on in the champagne rooms, however, a better quality camera system would be needed. According to Maroo, the views of the current cameras are blurry. He stated that sometimes it appears that something "questionable" might be going on inside a champagne room, but he does not want to interrupt unless he knows for certain.

213.    The undercovers asked Maroo about house fees charged to dancers. Maroo stated that he likes to be flexible with the fees in order to encourage dancers (and thus customers) to come. Usually, the fee is $10 if the dancer is on time and $5 for every 30 minutes late thereafter.

59

Maroo estimated that the club made about $100 per night during the week and up to $300 per night on the weekend in house fees.

214. The undercovers inquired about the club's relationship with its neighbors and with law enforcement. Maroo stated that there would always be people who "talk crap" but that he believed the club was well-regarded by its neighbors. He stated that he brings the neighbors on one side a case of beer from time to time, and the people who live on the other side were close with Miller. Maroo stated that the house across the street is typically "abandoned" because the owner is a soldier, but they try to help out by mowing the grass for him from time to time while he is away. Maroo stated that the town and law enforcement have been great and do not put much stock in the few complaints they get about the club.

215. Case agents later learned that Buzdum was monitoring the meeting on his phone via the camera system. During the meeting, he sent text messages to CHS, asking if CHS thought the undercover looked suspicious. The CHS provided the texts to the FBI.

216. On December 13, 2018, the undercover met with Buzdum in his basement office at the Dew Drop Inn. Buzdum stated that he keeps all of his records and receipts from TNT in the large gun safe there. During the course of the conversation, Buzdum produced records for 2018 from the safe and compared profits from before Childs' arrest with profits immediately afterwards. The undercovers also saw small tapes inside the safe that Buzdum said were register tapes for the bar till. Buzdum stated that although he combines money from both TNT and the Dew Drop Inn into one bank account under Tequila Nights, Inc., he still keeps separate records and receipts for both.

217. Buzdum repeatedly emphasized that he is an absentee owner and never comes to the club or gets involved in day-to-day business. He also stated many times how important it was

60

to run a clean establishment, make sure all of the employees are on payroll, and do things by the book. Buzdum admitted, however, that he currently skims $4,000 per month from TNT, which consists of cash from the video gambling machines and house fees that the dancers pay to work.

## V.  CONCLUSION

218.  Based on the information set forth above, I respectfully submit that this affidavit establishes probable cause for the issuance of the requested warrants.

61

## Attachment A

### Premises to Be Searched

The location known as the **Dew Drop Inn, 1027 N. 4th Street, Watertown, Wisconsin,** more particularly identified as:

A two-story commercial building painted cream with green trim. The ground level is used as a bar and has double rectangular windows and various banner advertisements. The upper level has rectangular windows with green shutters and contains an apartment. The Rock River runs along the southwestern side of the property. The southwestern side of the building has a deck with a railing on the upper level and stairs with a wooden banister that lead to the ground level. There is a parking lot behind the building, on the northeast side of the property, with two garages. The premises to be searched includes the garages, as well as the basement, which contains an office.





**Attachment B**
**(Dew Drop Inn)**

**Evidence to Be Seized**

All evidence, instrumentalities, information, records, and contraband relating to violations of Title 18, United States Code, Sections 1591 (sex trafficking); 1594 (conspiracy to engage in sex trafficking); 1952 (use of a facility in interstate commerce to promote, manage, or carry on unlawful prostitution activity); 1956 (money laundering), and 922(g)(3) (possession of firearms by unlawful user of controlled substances); and Title 26, United States Code, Sections 7201 (tax evasion), 7202 (willful failure to account for or pay tax), 7206(1) (tax fraud and false statements), and 7206(2) (assisting preparation of false or fraudulent tax documents), for the period of January 1, 2012 through the present, including:

1. Records and information concerning ownership and occupancy of the Premises;

2. Records and information regarding all past and present employees and independent contractors working for Radomir Buzdum, Tequila Nights, Inc., Wild Rose/TNT, the Dew Drop Inn, or any related business entity owned in whole or part by Radomir Buzdum, including hiring and termination records, identification documentation, wage and payment records, scheduling information, contact information, stage names, personnel files, and photographs;

3. All records and information regarding communications with employees, managers, or owners, independent contractors, or third parties (including customers, law enforcement officers, or members of the public), regarding work hours, scheduling, work rules, employee or customer behavior, advertising, or any activities or events taking place inside or outside of the Dew Drop Inn;

4. Records and information regarding purchases by customers, including credit card and point-of-sale information;

5. Records and information regarding the business, financial, or accounting affairs of Radomir Buzdum, Tequila Nights, Inc., Wild Rose/TNT, the Dew Drop Inn, or related business entities owned in whole or part by Radomir Buzdum, including but not limited to ledgers, account books, records, documents, appointment books, vendor lists, payroll and wage information, tax returns, tax return information, copies of tax returns, information returns, checks, currency, money orders, checkbooks, check registers, bank statements, safe deposit box records, credit applications, loan documents, loan statements, receipts, bills, invoices, credit card receipts, phone recordings, contracts, leases, real estate listing information, and correspondence in any form concerning the years 2012 through 2019;

6. Proceeds of sex trafficking or acts of prostitution, including United States currency and monetary instruments;

7. Records and information related to the operation of the automated teller machine (ATM) located inside the Dew Drop Inn;

8. Records and information related to the operation of the gambling machines located inside the Dew Drop Inn;

9. Any and all surveillance video recordings, recording equipment, and monitors, and any records relating to the purchase, use, installation, or operation of such systems;

10. Firearms, ammunition, magazines, firearm attachments, and any related manuals or ownership documentation; and

11. Indicia of unlawful use of controlled substances, including drug paraphernalia.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.